**Phoebe Wilson DILLON, Plaintiff,**

v.

**ANTLER LAND COMPANY of Wyola, a Montana corporation, et al., Defendants.**

**Civ. No. 891.**

United States District Court,
D. Montana,
Billings Division.

April 14, 1972.
As Amended May 2, 1972.

---

4. Hendry and Lee v. Masonite Corp., etc., 455 F.2d 955, [5 Cir., Opinion dated March 1, 1972].

Towe, Nealy & Ball, Billings, Mont., for plaintiff.

Hibbs, Sweeney & Colberg, Crowley, Kilbourne, Haughey, Hanson & Gallagher, Otis L. Packwood, U. S. Atty., Billings, Mont., for defendants.

## OPINION AND ORDER

RUSSELL E. SMITH, Chief Judge.

In October 1955 plaintiff, a Crow Indian, sold 1040 acres of land to the Antler Land Company of Wyola (hereafter Antler Land). In June 1970 she filed this action. In her first claim she seeks to vest the title to the land in herself or in the United States as her trustee and to recover rents and profits.

In support of the first claim, three theories, all stemming from plaintiff's status as an Indian, are urged: first, that there was fraud which vitiated the patent from the United States to plaintiff and the deed from her to Antler Land; second, that while the land was in trust status plaintiff executed a contract to convey it which, under the provisions of the General Allotment Act,[1] made the subsequent deed invalid; and third, that Antler Land on the date of the delivery of the deed owned lands in excess of the acreage limitations contained in Section 2 of the Crow Indian Allotment Act.[2] Motions for summary judgment are directed to the first claim.

■ In her second claim plaintiff seeks to recover $33,000.00 in damages, alleging that the agents of the United States, by refusing to take action in her behalf with respect to the 1040 acres, breached the duties enjoined upon them by 25 U.S.C. § 185.[3] A motion to dismiss is directed to the second claim.

Pursuant to Fed.R. Civ.P. 12(b) the court considers matters outside the pleadings and treats the motion to dismiss the second claim as a motion for summary judgment.

■ On the motions for summary judgment the court considers the defendants' answers to interrogatories and requests for admissions where favorable to plaintiff, the plaintiff's answers to interrogatories and requests for admissions, the affidavit of plaintiff in toto[4] and the affidavits filed on behalf of defendants to the extent they are not controverted. From all of this the following facts appear:

The Crow Reservation was created by treaty on May 7, 1868.[5] The lands here involved were within the reservation. They were allotted to plaintiff while she was still a minor by trust patents issued in 1923 and 1924. These patents provided that the United States would hold the lands in trust for 25 years and at the end of the trust period " . . .

---

1. 25 U.S.C. § 348 provides: "And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void . . . ."

2. Sec. 2. No conveyance of land by any Crow Indian shall be authorized or approved by the Secretary of the Interior to any person, company, or corporation who owns at least six hundred and forty acres of agricultural or one thousand two hundred and eighty acres of grazing land within the present boundaries of the Crow Indian Reservation, nor to any person who, with the land to be acquired by such conveyance, would become the owner of more than one thousand two hundred and eighty acres of agricultural or one thousand nine hundred and twenty acres of grazing land within said reservation. Any conveyance by any such Indian made either directly or indirectly to any such person, company, or corporation of any land within said reservation as the same now exists, whether held by trust patent or by patent in fee shall be void and the grantee accepting the same shall be guilty of a misdemeanor and be punished by a fine of not more than $5,000 or imprisonment not more than six months or by both such fine and imprisonment.

The classification of the lands of such reservation for the purpose of allotment and the allotment thereof shall be made as provided in the Act of Congress approved June 25, 1910 (Thirty-sixth Statutes at Large, page 859), which classification with any heretofore made by authority of law as to lands heretofore allotted shall be conclusive, for the purposes of this section, as to the character of the land involved.

Act of June 4, 1920, ch. 224, 41 Stat. 751.

3. "Whenever any Indian, being a member of any band or tribe with whom the Government has or shall have entered into treaty stipulations, being desirous to adopt the habits of civilized life, has had a portion of the lands belonging to his tribe allotted to him in severalty, in pursuance of such treaty stipulations, the agent and superintendent of such tribe shall take such measure, not inconsistent with law, as may be necessary to protect such Indian in the quiet enjoyment of the lands so allotted to him. R.S. § 2119."

4. On a trial on the merits the plaintiff might not be able to prove the facts stated in her affidavit and some of the inferences which the court draws from the affidavit might be unfounded.

5. 15 Stat. 649 (1868).

convey the same by patent to said Indian in fee, discharged of said trust and free from all charges and encumbrances whatsoever."

Plaintiff's father managed the land for her for some years. Matt Tschirgi[6] leased the land from plaintiff's father and later leased it through the Indian agency. On April 12, 1949, plaintiff was placed on the list of competent Crow Indians under the authority of the Crow Indian Allotment Act.[7] When plaintiff was declared to be competent she undertook the leasing and increased the rental from 14.23 cents per acre to 50 cents per acre. Tschirgi took advantage of the plaintiff's need for money and utilized a scheme prevalent on the reservation whereby leases were made for five years with rentals payable in whole or in part in advance. When the advance payments had been spent the white ranchers, including Tschirgi, were then in a position to apply economic pressure upon the Indians to obtain future concessions. Tschirgi's purpose was to obtain the land or the use of it for as little as possible and without regard for the values involved. In 1955 at a time when plaintiff needed money Tschirgi refused to advance any except on the condition that plaintiff apply for a fee patent. Upon her agreement to apply he loaned her $100.00.

On February 25, 1955, plaintiff applied for a fee patent. Tschirgi instructed plaintiff as to all of the representations that should be made to the Indian agency in order to obtain the fee patent, and she followed his instructions.

On May 21, 1955, she entered into a written contract to sell the land to Antler Land for $7280.00. A portion of the purchase price was a credit on advances previously made, and a sum of $570.00 was advanced on the date of the contract. At the time of the execution of the contract Tschirgi promised that he would, notwithstanding the written contract which called for a purchase price of $7.00 per acre, pay plaintiff whatever the appraised value of the land turned out to be. On August 23, 1955, the land was appraised at $10,400.00.

The application for a fee patent was approved after an investigation, and on October 3, 1955, a fee patent dated September 19, 1955, was delivered to plaintiff who on that date issued her receipt for it. On October 6, 1955, she executed and delivered a warranty deed to Antler Land. Plaintiff received $3,711.00 in cash. The balance of the purchase price was accounted for by the items of advances mentioned in the contract, including a deduction for prepaid lease rentals.

Before plaintiff executed the deed she asked Tschirgi what the appraised value was and Tschirgi told her that the appraised value was unimportant because she was bound by the contract which she had signed. Following the execution of the deed plaintiff determined that the appraised value was $10.00 per acre and asked Tschirgi for the additional money. He refused.

So far as the record here shows the only false statement made in the application for the patent was that no person had asked plaintiff to apply for a patent in fee. This false representation was made because Tschirgi advised plaintiff that the patent would not be issued if he were shown to be involved. As previously noted the contract to sell was dated May 1955, and the fact of its existence was not reported to the Indian agency although the application previously filed in February 1955 had stated that there were no contracts to sell. The application did state that the purpose for seeking the fee patent was to enable plaintiff to sell the land. There is nothing in the records of the Bureau of Indian Affairs which indicates that Tschirgi himself made any representations relative to the patent application.

The patent and deed were placed of record as of October 14, 1955. On the

6. Matt Tschirgi was the alter ego of Antler Land, and his acts are treated as the acts of Antler Land in this opinion.

7. 41 Stat. 755 (1920).

date of the conveyance Antler Land was the owner of more than 1,920 acres of grazing land within the Crow Indian Reservation and all of the successors in interest of Antler Land (except Murtha, trustee, the mortgagee) were likewise the owners of in excess of 1,920 acres of reservation lands at the time they acquired their interests in the land.

■ In the patent application plaintiff represented that she was competent and gave references to persons who could and did vouch for her competence. The finding of competency is not one merely implied from the issuance of the fee patent but is a considered finding made by the Superintendent of the Reservation and approved by the Area Director.[8] It is not claimed that there were misrepresentations made in the application proceedings which related to the issue of plaintiff's competency and plaintiff does not now assert that she was incompetent either in 1949 when first placed on the competent rolls or in 1955 when the patent issued.

■ It is my opinion, based on the facts I am obliged to assume in considering the motion for summary judgment, that the deed from plaintiff to Antler Land was voidable on the first (ordinary fraud) and second (violation of 25 U.S.C. § 348) theories presented and void on the third (violation of Section 2 of Act of June 4, 1920, 41 Stat. 751).

With respect to the first theory—that of fraud as it relates to the validity of the deed—there may be a genuine issue of material fact and it cannot be held that the defendants are entitled to a judgment on that issue as a matter of law.

As to the second theory:

■ The contract of May 21, 1955, made before the issuance of the trust patent, was void. The existence of the contract did not, however, prevent the plaintiff and Tschirgi from dealing with the land after the issuance of the fee patent,[9] provided that there was a new meeting of the minds and that a subsequent deed resulting from those dealings was not a product of the contract. If as claimed here Tschirgi exerted economic pressure upon plaintiff to secure a contract in violation of the congressional policy expressed in 25 U.S.C. §§ 348 and 349 [10] and then after the issuance of the fee patent Tschirgi secured a deed by misrepresentations or by reason of the mistaken belief of plaintiff that she was obliged to perform the contract, then the deed is the illegal fruit of an illegal contract. In short, if it is shown as a fact that the contract was a factor inducing the execution of the deed, the deed was voidable.

As to the third theory:

The original deed conveying the land to Antler Land was accepted by Antler Land in violation of Section 2 of the Crow Act and was void. Defendants seriously urge that Section 2 relates only to conveyances of trust lands. The report of the conference committee indicates that the purpose of Section 2 of the Crow Act was to prevent any one person from accumulating large holdings on the reservation. Thus the statement of the House managers accompanying a conference committee report said ". . . it is not thought to be either good public policy or for the best interests of the Indians to permit any one person, firm or corporation to acquire any great acreage of the land. . ."[11]

---

8. The authority of the Superintendent and the Area Director are delineated by 25 C.F.R. § 121.2 (1972) and Commissioner's Order 551, §§ 3 and 4, 16 Fed. Reg. 2939 (1951).

9. Andreas v. Henderson, 160 F.Supp. 252 (S.D.Cal.1958).

10. The contract here in effect made the land liable for debts incurred prior to the issuance of the fee patent in violation of the policy expressed in 25 U.S.C. § 349 as follows: ". . . and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent. . . ."

11. H.R.Rep.No.1043, 66th Cong., 2d Sess. 3–4 (1920).

The same thought is expressed elsewhere in the legislative history.[12] Section 2 poorly effectuates this legislative purpose because it did not absolutely prohibit large holdings on the reservation in that it forbade only the initial conveyances by or on behalf of the Indians. Thus if corporations A through J inclusive each made an independent purchase of 920 acres of Crow lands and then corporations A through I all lost their lands on mortgage foreclosures, the act did not prohibit corporation J from purchasing at the foreclosure sales and accumulating in this manner 9,200 acres of Crow land. Even so, if the purpose was to prohibit large holdings there was no reason to distinguish between conveyances made or approved by the Secretary of the Interior of trust lands and conveyances by the Indians of fee lands—the effect in terms of size of the holdings was the same in either case.

Certainly the first sentence, "[n]o conveyance of land by any Crow Indian shall be authorized or approved by the Secretary of the Interior," does relate to conveyances required to be approved by the Secretary. But the second sentence, "[a]ny conveyance by any such Indian," relates to conveyances by Indians. The words "such Indian" in the second sentence relate back to the words "Crow Indian" in the first sentence. The fact that the first sentence deals with Secretarial approval does not require that the words "Crow Indian" appearing in the first sentence and adopted by the word "such" in the second sentence be modified in the adoption by the addition of the words "whose land is in trust status." It does less violence to the language of Section 2 to hold that the first sentence relates to the Secretary of the Interior and the second sentence relates to Crow Indians than to hold that the words "any conveyance by any such Indian" do not mean *any* conveyance but only conveyances of trust land.

The words "whether held by trust patent or by patent in fee" make it impossible to relate the second sentence of Section 2 to trust lands only. Defendants urge that these words somehow refer to the grantee purchaser's title. As to grantees who are white persons or corporations the words "whether held by trust patent" simply have no meaning because a white grantee would never hold by a trust patent. If we eliminate the descriptive words in the second paragraph it reads: "Any conveyance by any such Indian made . . . of . . . land . . . whether held by trust patent or by patent in fee shall be void." On such reading it is apparent that the "whether held" clause relates to the word "land."

■ Defendants likewise urge that to apply Section 2 of the Crow Act to patent-in-fee lands puts Section 2 in conflict with that part of 25 U.S.C. § 349 which reads as to patent-in-fee lands " . . . and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed. . . ." In *my opinion* the effect of Section 2 of the Crow Act was to limit the power of a buyer to buy. The Indian was not forbidden to sell; the penalty was directed solely at the buyer. It is true that Section 2 of the Crow Act did limit the market for Indian land to small landowners and big ones willing to gamble, but it did not place a restriction on the power of the Indian to sell or encumber his land. Many laws limit the capacity of persons and corporations to own land. Such limitations appear in connection with federally financed irrigation districts, aliens, and corporate powers. Such laws relate to the capacity to buy and own, not to the capacity of an owner to sell. It cannot be said therefore that Section 2 of the Crow Act, which limited the capacity of buyers to acquire Indian lands, placed a restriction as to sale or encumbrance of the lands contrary to 25 U.S.C. § 349.

■ It is my opinion that the rights which plaintiff had to avoid her deed on the ground of fraud and because of the

---

12. H.R.Rep.No.789, 66th Cong., 2d Sess. (1920).

violation of 25 U.S.C. § 348 and the right, if she had any right,[13] to avoid the deed by reason of the violation of Section 2 of the Crow Act are all barred by the Montana Statutes of Limitations.

The General Allotment Act throughout its history [14] has and the Crow Act does distinguish the competent from the incompetent Indian and the trust lands from the fee lands. State law controls here because Congress has explicitly said that it does. The language of 25 U.S.C. § 349 is " . . . when the lands have been conveyed to the Indians by patent in fee . . . then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State . . ."[15]

The patent exists. It has not been cancelled.

 Plaintiff argues that the United States might bring an action on plaintiff's behalf to cancel the patent and that state limitations would not bar such an action. It is not necessary to decide what right the United States might have in this case to sue on behalf of the plaintiff because the United States not only has not done so, but has refused to do so. For very substantial reasons the plaintiff may not, by joining the United States as a party defendant, force the United States to accept the role of party plaintiff or equate her rights with the rights which the United States might assert did it choose to assert them. The determination that the plaintiff was competent and the decision to issue her a fee patent were executive decisions made for the purpose of ending the trusteeship. The decision carried out an apparent congressional policy to put Indians into the mainstream of American life when competent to manage their own affairs. The issuance of the fee patent had a broader effect [16] than merely to free plaintiff to sell her land—it freed the United States from its trustee duties and altered the relationship of the land and plaintiff to the State of Montana. Whether the United States should, assuming a right to do so, now bring an action to set aside those executive decisions by cancelling the patent and restoring the plaintiff to her dependent status poses an executive problem to be answered in the exercise of

13. This opinion does not decide whether an Indian who sold to a buyer ineligible to take lands by reason of Section 2 of the Crow Act may bring an action to recover the land. In somewhat analogous situations grantors who have been paid by a grantee lacking power to take are not permitted to recover the thing sold. *See* Abrams v. State of Washington, 45 Wash. 327, 88 P. 327 (1907); Fairfax's Devisee v. Hunter's Lessee, 11 U.S. (7 Cranch) 603, 3 L.Ed. 453 (1812); Craig v. Radford, 16 U.S. (3 Wheat.) 594, 4 L.Ed. 467 (1818), all involving aliens; and Fritts v. Palmer, 132 U.S. 282, 10 S.Ct. 93, 33 L.Ed. 317 (1889); Benedict v. Bd. of Comm'rs of Lincoln County, 161 Okl. 50, 17 P.2d 454 (1932); Texas Co. v. State, 198 Okl. 565, 180 P.2d 631 (1947); Kerfoot v. Farmers' and Merchants' Bank, 218 U.S. 281, 31 S.Ct. 14, 54 L.Ed. 1042 (1910); Long v. Georgia Pac. R.R., 91 Ala. 519, 8 So. 706 (1891); Parish v. Wheeler, 22 N.Y. 494 (1860), all dealing with corporations which for some reason lacked a power to take.

Pointing in a different direction, however, the cases dealing with statutes which make any conveyance of land void may be thought to be persuasive in the interpretation of Section 2 of the Crow Act, which makes conveyances to certain persons void. *See* Heckman v. United States, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912) (dictum); Gerard v. United States, 167 F.2d 951 (9th Cir. 1948); Colombe v. Wilson, 29 S.D. 49, 135 N.W. 668 (1912).

14. Act of Feb. 8, 1887, Ch. 119, § 5, 24 Stat. 389–390; Act of May 8, 1906, Ch. 2348, 34 Stat. 182, now codified as 25 U.S.C. §§ 348 and 349.

15. *See* Larkin v. Paugh, 276 U.S. 431, 48 S.Ct. 366, 72 L.Ed. 640 (1928); Dickson v. Luck Land Co., 242 U.S. 371, 37 S.Ct. 167, 61 L.Ed. 371 (1917); United States v. Waller, 243 U.S. 452, 37 S.Ct. 430, 61 L.Ed. 843 (1917); Bonds v. Sherburne Mercantile Co., 169 F.2d 433 (9th Cir. 1948).

16. *See* Montana Enabling Act, Act of Feb. 22, 1899, § 4, 25 Stat. 676; and Ordinance No. 1, Mont.Const., R.C.M.1947, Vol. 1, pt. 1, p. 328; Montana Power Co. v. Rochester, 127 F.2d 189 (9th Cir. 1942).

the wide discretion vested in the Attorney General of the United States.[17] The question of whether the United States should bring such an action or should leave the fee patent Indian to the remedies afforded her by private litigation under state law involves considerations different from the issues to be resolved in the lawsuit itself. *See* United States v. Minnesota, 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539 (1926); Smith v. United States, 375 F.2d 243 (5th Cir. 1967). An attorney general might in his discretion conclude that Indians should not slip in and out of the trust status at the will of the Indian, that an Indian who sought a declaration of competency and who does not now claim to have been incompetent, and who if there was fraud leading to the procurement of the patent was a participant in the fraud, should not utilize the energies of the United States to revoke a finding of competency which is not even now said to be incorrect to protect rights which the Indian could have protected in litigation conducted by herself.

The point of all this is that before the United States becomes a plaintiff in a lawsuit an executive decision must be made. It has not been made in this case. Plaintiff, by joining the United States,[18] cannot make that executive decision for the United States, nor can the plaintiff empower this court to make that decision. 28 U.S.C. § 1361 giving the district courts jurisdiction of mandamus actions to compel an officer of the United States to perform a duty owed to plaintiff would not, assuming proper parties, permit the court to compel the exercise of a discretionary duty.[19]

The duty of the United States is said to arise under 25 U.S.C. § 185.[20] This section, enacted in 1862, remains in its initial form. It does cast upon the Indian agents and superintendents a duty to protect Indians in the enjoyment of their allotments. To hold, however, that it imposes a duty in the United States or its agents to litigate all title problems which may be created by an emancipated Indian dealing with lands which as indicated are subject to state law would be to ignore the subsequently enacted laws governing Indians. 25 U. S.C. § 185 does not, in light of the previously quoted language from the General Allotment Act and the Crow Act, continue forever the trusteeship of the United States over the fee lands of emancipated Indians [21] and does not impose a duty in the United States to litigate cases arising out of the dealings by Indians with their patent-in-fee lands.

In short, this is an action brought by a competent plaintiff to enforce individual rights. It is not an action by the United States or the equivalent of an action by the United States. State limitations apply.

The facts bearing upon the adverse possession problem are largely admitted. It is agreed that: the defendants have at all times since October 6, 1955, claimed to be the legal owners of and have continuously occupied, possessed, and used the lands described in the complaint for the agricultural and ranching purposes for which said lands are suitable; have paid all of the taxes legally levied and assessed; have over the period from September 1955 to January 25, 1967, placed of public record, in addition

17. 28 U.S.C. § 515; Sutherland v. International Ins. Co. of New York, 43 F. 2d 969 (2d Cir. 1930); Parker v. Kennedy, 212 F.Supp. 594 (S.D.N.Y.1963).

18. To treat this case as an action by the United States it would be necessary to ignore the motion to dismiss filed by the United States Attorney and treat the actions of the plaintiff's counsel as those of the United States. This obviously can-

not be done. Sutherland v. International Ins. Co. of New York, *supra*.

19. Prairie Band of Pottawatomie Tribe of Indians v. Udall, 355 F.2d 364 (10th Cir. 1966); Mollohan v. Gray, 413 F.2d 349 (9th Cir. 1969); United States v. Walker, 409 F.2d 477 (9th Cir. 1969); Dodge v. Nakai, 298 F.Supp. 17 (D.Ariz.1968).

20. *Supra* at n. 3.

21. Montana Power Co. v. Rochester, *supra*.

to the patent, six documents disclosing defendants' claims to all or a part of the lands involved. It appears by an uncontradicted affidavit that the lands were enclosed by a fence. The facts bearing upon the claim of fraud were known by plaintiff as early as 1956, and the other facts were known by the plaintiff as they developed.

■■■ Under these circumstances the defendants have acquired a title by adverse possession as against the plaintiff.[22] It is not necessary to decide whether a void deed may constitute color of title [23] because a claim of title not founded upon a written instrument may ripen into a title by adverse possession if as here the requirements of R.C.M. 1947 §§ 93–2510 and 2511 are met.[24]

■■■ Plaintiff urges that the Montana Statutes of Limitations should be tolled during the period within which plaintiff was attempting to get the United States to bring this action. The answer to this, as to most of plaintiff's contentions, is that state law does control and there is nothing in the law which tolls limitations on the suggested grounds.

■■■ The second claim is, as previously indicated, asserted against the United States under the Federal Tort Claims Act [25] for the failure of the United States to assert on plaintiff's behalf the claims made by her in her first claim in this action. It fails because, first, as previously indicated, there is no duty imposed by 25 U.S.C. § 185 upon the United States to litigate the cases arising out of the dealings of emancipated Indians with fee lands and, second, because in any event the duty to sue could never be anything but a discretionary duty to which the Federal Tort Claims Act does not apply.[26]

It is therefore ordered that a summary judgment be entered denying plaintiff the relief sought under the first and second claims and quieting the defendants' title against the plaintiff. The defendants shall prepare a judgment pursuant to Rule 14(b) of the Rules of this Court.

22. What is said here does not purport to affect the right of the United States to enforce, if it has a right to do so, the policy expressed by Section 2 of the Crow Act, whatever that policy may be.

23. There is some indication that under Montana law it may. Hentzy v. Mandan Loan and Investment Co., 129 Mont. 324, 286 P.2d 325 (1955).

24. Thibault v. Flynn, 133 Mont. 461, 325 P.2d 914 (1958).

25. 28 U.S.C. § 1346(b).

26. 28 U.S.C. § 2680(a).