George WIPPERT, Sr., and Henrietta Wippert, husband and wife, Plaintiffs,

v.

BURLINGTON NORTHERN INC., a Delaware Corporation, Defendant.

No. CV 74-12-GF.

United States District Court, D. Montana, Great Falls Division.

July 14, 1975.

Graybill, Ostrem, Warner & Crotty, Great Falls, Mont., for plaintiffs.

Gough, Booth, Shanahan & Johnson, Helena, Mont., for defendant.

## OPINION AND ORDER

RUSSELL E. SMITH, Chief Judge.

This is an action in which plaintiff seeks actual and exemplary damages stemming from an alleged trespass on plaintiff's real property.

The plaintiff Henrietta Wippert is the beneficial owner of about 75 acres of land located on the Blackfeet Indian Reservation in Montana by virtue of a deed which conveyed the land to the United States in trust for her. The land was subject to an easement in favor of the defendant. On January 2, 1972, and again on December 26, 1972, defendant's train derailed, and railroad cars entered the plaintiff's land. The train was derailed by the action of a strong wind and the invasion of plaintiff's property was not due to any negligence on the part of the defendant. Defendant moved for summary judgment on the ground that the United States was an indispensable party, and as to the first cause of action on the ground that a Montana statute of limitations had run. The court denied the motion on the indispensable party issue[1] and granted it as to the first cause of action on the limitations issue. The case was tried to the court without a jury, briefs have been filed, and the case is now ready for decision.

At the outset the problem arises—what law applies? The parties have not considered the problem, both assuming that Montana law controlled. The action was initiated in the state court[2] and removed here on diversity grounds. In her complaint and in the pretrial order plaintiff specifically relied upon the Montana statute, R.C.M.1947 § 93–6103, providing for treble damages in cases involving cutting of trees. Defendant relies on R.C.M.1947 § 93–2607, a limitations section.

In *Kennerly v. District Court of Montana*, 400 U.S. 423, 91 S.Ct. 480, 27 L. Ed.2d 507 (1971) the Supreme Court held that the courts of Montana did not have jurisdiction of civil disputes arising on the Blackfeet Reservation involving Blackfeet Indians. In *Kennerly* the

---

1. The order is as follows: "Defendant's motion for summary judgment based upon the lack of an indispensable party is denied. See *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365 [88 S.Ct. 982, 19 L.Ed.2d 1238] (1968); *Aqua Caliente Band of Mission Indians v. County of Riverside*, 442 F.2d 1184, 1186 (9th Cir. 1971)."

2. See *McCrea v. Busch*, Mont., 524 P.2d 781 (1974); *Bad Horse v. Bad Horse*, 163 Mont. 445, 517 P.2d 893 (1974).

Court considered the power of a state court to entertain a contractual dispute originating on a reservation between a non-Indian and an Indian. It did not expressly deal with rule of law applicable on reservations. Even so the majority opinion uses language indicating that the State has no jurisdiction to define rights or impose obligations upon Indians with respect to matters occurring on reservations:

> The Court in *Williams* [*Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L. Ed.2d 251], in the process of discussing the general question of state action impinging on the affairs of reservation Indians noted that "[e]ssentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." 400 U.S. at 426–27, 91 S.Ct. at 482.

In the dissenting opinion this language appears:

> This case does not involve state action infringing "the right of reservation Indians to make their own laws and be ruled by them.") 400 U.S. at 430, 91 S.Ct. at 484.

Even in the absence of the quoted language it would appear to the court that a state without power to extend the jurisdiction of its courts over certain disputes could not make its substantive law the basis for the resolution of those dis-

putes. The law of Montana as such does not control the reservation.

The fact which is judicially noted is that the Blackfeet Tribe has never enacted any comprehensive body of civil law.[3] There are no Blackfeet laws regulating the relationships which need to be regulated if the Indians and non-Indians on the reservation are to carry on work necessary for survival in the twentieth century. There is virtually no law of torts, no workman's compensation law, no law of contracts, no law regulating utilities, no law regulating labor relations—in short, there is no comprehensive body of civil law. In the main it is impossible to look to the Indian tradition for help[4] because many of the kinds of relationship which need regulation did not exist in pre-reservation Indian society; they were brought into the Indian life by the economic and social system of the non-Indians. Although Indian law applies, there is for the most part no discoverable law created by legislative action of the tribe.

The Blackfeet people have not, however, been living in a legal vacuum. I judicially note that until the decision in *Kennerly v. District Court of Montana, supra,* the state courts of Montana in nonfederal law cases exercised civil jurisdiction over the reservation and applied Montana law as the rule of decision.[5] When on November 20, 1967, the Blackfeet Tribal Council adopted

3. This case exemplifies the difficulties that the perpetuation of legal fictions can engender. Once an Indian tribe moved onto a reservation because it lost or didn't fight an Indian war, that tribe as a matter of fact ceased to be sovereign. The concept of Indian sovereignty was given the coup de grace by the Act of March 3, 1871, 16 Stat. 566, 25 U.S.C. § 71, which forbade the recognition of an Indian tribe as an independent nation. Nonetheless, apparently unaware that on many reservations the Indians along with the non-Indians have moved into the twentieth century, Congress and the courts have given lip service to the fiction of sovereignty (which at one time was no fiction)

without recognition of the fact that at least in the case of many reservations sovereignty, if exercised at all, was exercised in very limited areas.

4. It is possible that were we to look at the Indian tradition before it was influenced by white culture we would find that there were no private ownerships which would support an action of trespass.

5. So ingrained is the assumption that state law governs that, as previously noted, plaintiff's counsel in this case filed the action in a state court and based it on state law.

Chapter 2, Civil Action § 1, reading in part:

> "The Tribal Court and the State shall have concurrent and not exclusive jurisdiction of all suits wherein the defendant is a member of the Tribe which is brought before the Courts. . . ." *Kennerly v. District Court of Montana, supra,* at 425, 91 S.Ct. at 481.

it recognized so far as state jurisdiction was concerned what was in fact happening. The resolution does not speak to the body of law to be applied, but it at least indicates that the tribe did not consider the State of Montana to be completely alien and it was a consent, albeit ineffectual,[6] that at least the procedural law of the State might be applied to reservation Indians. For the reason that by a course of conduct the Indians themselves have treated the law of Montana as a governing law, this court will, until told by a higher court to do something else, apply the substantive civil law of Montana in all nonfederal law cases involving reservation Indians and reservation transactions where there is no clearly ascertainable Indian law.

■■ The court has reexamined the order dismissing the plaintiff's first cause of action and reaffirms it. While Indian law (found, as noted, by reference to the laws of Montana) gave the plaintiff a remedy for trespass, the Montana procedural law applies, whether adopted by the Indians or not, because Montana[7] when enforcing the substantive law of other jurisdictions is free to employ its own procedural rules, including the statute of limitations.

The previous order on the limitations issue read: "Defendant's motion for summary judgment on the first claim is granted. Whether the claim be one for trespass or one to establish liability under a statute, the period of limitation is two years. R.C.M.1947, § 93–2607. There are alleged two separate torts following separate train derailments at different places. The invasion of plaintiff's property on the first occasion ceased prior to February 1, 1972. At that time the cause of action accrued even if the damages continued into the future. *Nelson v. C & C Plywood Corp.,* 154 Mont. 414, 465 P.2d 314 (1970); *Pappas v. Braithwaite,* 117 Mont. 569, 162 P.2d 212 (1945); *Watson v. Colusa-Parrot Mining & Smelting Co.,* 31 Mont. 513, 79 P. 14 (1905). There is nothing to indicate that the second invasion of the property was a continuation of the first one."

■ These limitations apply whether the cause of action originated within the jurisdiction of the state or not. *See Bahn v. Estate of Fritz,* 92 Mont. 84, 10 P.2d 1061 (1932). A somewhat anomalous situation is reached here in that this identical cause might have been pursued by the United States on behalf of the plaintiff and limitations would not have barred such an action. In *Dillon v. Antler Land Co.,* 341 F.Supp. 734 (D.Mont.1972), *aff'd,* 507 F.2d 940 (9th Cir. 1974), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975), state limitations were applied even though in an action by the United States for the *cestui que* trust, the limitations would have been avoided.[8]

---

6. *Kennerly v. District Court of Montana,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971).

7. In a diversity case this court sits as would a state court and applies the limitations applicable in the state courts. *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Ragan v. Merchants Transfer & Warehouse Co.,* 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949); *Lehtonen v. E. I. DuPont DeNemours & Co.,* 389 F. Supp. 633 (D.Mont.1975).

8. This court said in *Dillon v. Antler Land Co.,* 341 F.Supp. 734, 742 (1972), *aff'd,* 507 F.2d 940 (9 Cir. 1974), *cert. denied,* 421 U. S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975): "In short, this is an action brought by a competent plaintiff to enforce individual rights. It is not an action by the United States or the equivalent of an action by the United States. State limitations apply."

In *Dillon* the case was in the federal court because of a federal question, and state limitations applied because Congress had made state law applicable to the transaction. Here the limitations apply because the plaintiff sought the state forum and is bound as are all other litigants by the procedural rules applicable in that forum.

█ There is neither statutory nor case law in Montana relating to an entry to reclaim goods on land without "wrong of actor" and the court, as it has in the past,[9] turns to Restatement (Second) of Torts § 198 (1965) as a source of Montana law. The rule is there stated in this language:

> § 198. Entry to Reclaim Goods on Land Without Wrong of Actor
>
> (1) One is privileged to enter land in the possession of another, at a reasonable time and in a reasonable manner, for the purpose of removing a chattel to the immediate possession of which the actor is entitled, and which has come upon the land otherwise than with the actor's consent or by his tortious conduct or contributory negligence.
>
> (2) The actor is subject to liability for any harm done in the exercise of the privilege stated in Subsection (1) to any legally protected interest of the possessor in the land or connected with it, except where the chattel is on the land through the tortious conduct or contributory negligence of the possessor.

Burlington Northern was not a trespasser when it entered the plaintiff's land, but it was liable for any damages done to the land in the removal of the railroad cars.

█ The rule of damage to be applied is stated in *Spackman v. Ralph M. Parsons Co.*, 147 Mont. 500, 506–507, 414 P. 2d 918, 921 (1966), as follows:

> . . . Where damage to property is concerned, the purpose of awarding damages is to return the party injured to the same, or as nearly possible the same, condition as he enjoyed before the injury to his property. The injured party is to be made as nearly whole as possible—but not to realize a profit. Compensatory damages are designed to compensate the injured party for actual loss or injury —no more, no less.

R.C.M.1947, § 17–401, states:

> "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

Ingenious men have propounded ingenious methods, systems and formulas for determining in monetary terms the value of property partially damaged or destroyed. While such methods serve as useful guides, the final answer rests in good sense rather than mechanical application of such formulas.

One such formula is that of market value—the market value of the property destroyed at the place of destruction immediately before its destruction—and we will adopt that measure as a guide to common sense.

Another guide or measure concerns property damaged but not totally destroyed, in which case the generally accepted estimate of damages is the difference in market value at the place before and after injury. But if repair is possible, and this cost is less than the diminution in value under the general test, this cost plus the value of the loss of use may be employed as the measure. In either case, the recovery ordinarily may not exceed the value of the property just before it was damaged. See generally Damages to Persons and Property, Oleck, 1961 Ed., § 202, p. 363.

---

9. *Jacobson v. Colo. Fuel & Iron Corp.*, 409 F.2d 1263 (9th Cir. 1969); *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir. 1968).

The above principles guide us toward good judgment and fair compensation.

In separate findings of fact the court has assessed the damages at Four Hundred Seventy-Five Dollars ($475.00). Let judgment be entered accordingly.

NOTE: The action as to George Wippert was dismissed but the caption has been retained for indexing convenience.