The CROW TRIBE OF INDIANS,
Plaintiff,

v.

CAMPBELL FARMING CORPORATION, Robert Earl Holding, Sinclair Oil Corporation, d/b/a Sunlight Ranch Co., Sun Valley Co. and KMH Ranch Company, Defendants,

and

A.G. Ballensky Co., et al., Defendants–Intervenors.

No. CV 91–52–BLG–JOS.

United States District Court,
D. Montana,
Billings Division.

July 15, 1992.

Robert S. Pelcyger, Boulder, CO, Thomas E. Towe, Billings, MT, for plaintiff.

Laurence R. Martin, Sol Lovas, George Dalthorp, Hugh Sweeney, Billings, MT, Peter M. Johnson, Salt Lake City, UT, for defendant.

## MEMORANDUM AND ORDER

SHANSTROM, District Judge.

The Crow Tribe of Indians (hereafter "Tribe") filed this lawsuit, seeking a declaratory judgment that the defendants Campbell Farming Corporation (hereafter "CFC"),[1] Robert Earl Holding, Sinclair Oil Corporation, d/b/a Sunlight Ranch Company, Sun Valley Company and KMH Ranch Company, as well as 162 farmer/rancher Intervenors (hereafter all parties are referred to collectively as "defendants"), are in violation of § 2 of the Crow Allotment Act of 1920, 41 Stat. 751. The Tribe seeks an order enjoining the defendants "from continuing to violate Section 2" and damages that will compensate the Tribe for defendants' "illegal use, occupancy and enjoyment of land within the Crow Res-

---

1. The Complaint lists "Campbell Farming, Inc." but CFC's correct legal name is Campbell Farming Corporation.

ervation," as well as damages for "trespass." In a nutshell, the Tribe asserts that § 2 requires this Court to declare void the defendants' title to land in excess of that allowed by § 2, and convey it to the Crow Tribe, a stranger to that title, without consideration for how long the defendants have held title and when and by whom the land was originally conveyed, nor for the improvements thereon (i.e., homes, buildings, fencing, etc.). Moreover, rather than compensating the present title-holders, the Tribe, on the basis of its alleged entitlement under § 2, seeks compensation from the defendants as they leave the property they assumed for years they legally owned. All this the Tribe seeks in the name of "equity." No completely accurate figures have been offered but it is no exaggeration to say the present lawsuit affects not only the named defendants, but generations of numerous families, hundreds-of-thousands of acres, and millions of dollars.[2]

With the intensity so characteristic of all the briefing on the pending motion (briefing which exceeds 450 pages), defendant CFC contends, "Section 2 is an anachronistic and outdated law, which has never been effectively enforced during any of the seventy-one years since its enactment." (Brief of Defendant Campbell Farming Corporation In Support of Motion to Dismiss, p. 4). While expressing that predisposition toward § 2, the defendants have moved to dismiss the Complaint, or in the alternative, for summary judgment, on numerous grounds.

Whether § 2 is, in fact, "an anachronistic and outdated law" is not for this Court to decide. That argument must be made to Congress. The motion to dismiss, however, is in the appropriate forum and, upon careful consideration, I am prepared to rule.

## BACKGROUND AND FACTS

The Indian General Allotment Act of 1887, commonly referred to as the Dawes Act,[3] culminated years of debate on allotment proposals and provided for mandatory allotment of certain tribal lands to individual Indians.[4] The original Dawes Act allotted acreage to each head of a household. An 1891 amended version of the Dawes Act provided allotments of 80 acres of agricultural land, or 160 acres of grazing land, to each Indian. Act of Feb. 28, 1891, ch. 383, §§ 1–2, 26 Stat. 794 (codified as amended at 25 U.S.C. § 331).

Section 5 of the Dawes Act provided that title to allotments be held in trust by the United States for twenty-five years, or longer if the President so desired. During the trust period, encumbrances and conveyances were void. Generally, the laws of descent and partition in the state or territory where the lands were located applied following the termination of the trust period when patents were executed and delivered.[5]

Following the passage of the Dawes Act, a process of piecemeal amendment began. The Appropriations Act of June 21, 1906, gave the President discretion to extend the trust period of any allottee for as long as deemed necessary. Ch. 3504, § 1, 34 Stat. 325, 326 (codified at 25 U.S.C. § 391). The Burke Act of 1906 gave authority to the Secretary of the Interior alone to issue a patent in fee before the expiration of the trust period "whenever he shall be satisfied

---

**2.** A 1977 study by the Native American Rights Fund identified 56 persons on the Crow Indian Reservation who, at that time, owned more than the acreage specified in § 2. Collectively, those 56 persons owned more than 285,000 acres of land on the Reservation. *See* Exhibit 1 to Plaintiff's Complaint; Audit Report prepared by Office of Inspector General, Department of Interior. *All non-Crow Indian land holdings on the Reservation in excess of the acreage specified in § 2 are potentially at risk if the Tribe prevails in this action.* If the Tribe prevails, non-Crow landowners with small portions of land will be affected as well as the owners of larger portions. It would be possible for someone owning as few as 641 acres to be held in violation of § 2.

**3.** 24 Stat. 388, codified as amended at 25 U.S.C. §§ 331–334, 339, 341, 342, 348, 349, 354, 381.

**4.** *See generally* D. OTIS, THE DAWES ACT AND THE ALLOTMENT OF INDIAN LANDS (F. Prucha ed.) (Norman: University of Oklahoma Press, 1973), pp. 3–7.

**5.** *See* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW (1982 ed.), Ch. 2, Sec. C, pp. 127–143 for a good general discussion of allotments and assimilation.

that any Indian allottee is competent and capable of managing his or her affairs." Ch. 2348, § 1, 34 Stat. 182, 183 (codified at 25 U.S.C. § 349). In 1934 the Indian Reorganization Act indefinitely extended the trust period of all allotments subject to it that were still in trust. 25 U.S.C. § 462. The Act also provided that no further lands were to be allotted. 25 U.S.C. § 461.

The policy of the Dawes Act was the eventual assimilation of Indian tribes into the mainstream of American culture.[6] From time to time Congress passed special Allotment Acts directed at certain tribes pursuant to that policy of assimilation.[7]

On June 4, 1920, Congress enacted a statute, pursuant to the expressed policy of assimilation, commonly known as the Crow Allotment Act of 1920 (41 Stat. 751) (hereafter "1920 Act"). § 2 of the 1920 Act, as subsequently amended by the Act of June 8, 1940, 54 Stat. 252, provides in pertinent part:

No conveyance of land by any Crow Indian shall be authorized or approved by the Secretary of the Interior to any person, company, or corporation who owns at least six hundred and forty acres of agricultural or one thousand two hundred and eighty acres of grazing land within the present boundaries of the Crow Indian Reservation, nor to any person who, with the land to be acquired by such conveyance, would become the owner of more than one thousand two hundred and eighty of agricultural or one thousand nine hundred and twenty acres of grazing land within said Reser-

vation. Any conveyance by any such Indian made either directly or indirectly to any such person, company, or corporation of any land within said Reservation as the same now exists, whether held by trust patent or patent in fee shall be void and the grantee accepting the same shall be guilty of a misdemeanor and be punished by a fine of not more than $5,000 or imprisonment not more than six months or by both such fine and imprisonment.

.        .        .        .        .

The classification of the lands of such Reservation for the purpose of allotment thereof shall be made as provided in the Act of Congress approved June 25, 1910 (Thirty-sixth Statutes at Large, page 859), which classification with any heretofore made by authority of law as to lands heretofore allotted shall be conclusive, for the purposes of this section, as to the character of the land involved.

41 Stat. 751

Allotments made pursuant to the 1920 Act were, under the terms of § 1, to "vest title in the allottee" subject only to existing tribal leases, which were not to be renewed or extended. Individual allotments were to be evidenced by patents in fee to "competent" Indians. Trust patents were to issue to minors and "incompetent" Indians. 41 Stat. 751, § 1.

The Legislative History of § 2 of the 1920 Act indicates a policy of preventing the exploitation of individual Crow allottees.[8] Sub-

6. *See* COMM'R IND.AFF.ANN.REP., H.R.EXEC. DOC. NO. 1, 51st Cong., 1st Sess. 3–4 (1889) ("tribal relations should be broken up, socialism destroyed, and the family and the autonomy of the individual substituted"); *see also* D. OTIS, supra note 6 at 8–9; F. COHEN, supra note 7 at 127–143; H.REP. 1576, 46th Cong., Sess. 2, 6; 11 Cong.Rec. 906 (Jan. 25, 1881); 15 Cong.Rec. 190–91; 8 Interior Dec. 647, 650 (1889); Instructions, 48 Interior Dec. 41, 43, 45 (1921).

7. This policy continued in effect until passage of the Indian Reorganization Act of 1934, also known as the Wheeler–Howard Act. 25 U.S.C. § 461 et seq. This Act was an encouragement to tribal self-government.

8. *See e.g.*, H.R.CONF.REP. No. 1043, 66th Cong., 2d Sess. 3–4, *reported in* 59 *Cong.Rec.* 7845 (1920); *Indian Tribes of Montana: Hearings Be-*

*fore a Subcomm. of the House Comm. on Indian Affairs*, 66th Cong., 1st Sess. 18, 25 (1919); *Allotments to Crow Indians: Hearing Before the Senate Comm. on Indian Affairs on S. 2890*, 66th Cong., 1st Sess. 23 (1919); and S.REP. No. 219, 66th Cong., 1st Sess. 6 (1919). While there is a significant legislative history on § 2, it is potentially confusing when considered in light of the larger policy of assimilation behind the Dawes Act. There is no indication in the legislative history that § 2 was intended to contravene the policy of the eventual assimilation of the Indian population. It is reasonable therefore to read the legislative history of § 2 to prevent the exploitation of individual Crow allottees by opportunistic speculators and absentee purchasers of land that should be used by the individual Crow Indian to aid in his or her assimilation into the mainstream of American culture. An alternative reading of § 2 as intended to protect the integrity

sequent to the enactment of the 1920 Act, attention to § 2 fluctuated. At times, the government required an affidavit of compliance with § 2 from each buyer in a supervised sale. At other times, compliance was not required or enforced. In any event, the record before the court indicates that neither the Crow Tribe nor the United States, in its capacity as trustee, has enforced § 2 during the seventy-one years of its existence prior to this action. *See* Complaint, para. 10.

On March 4, 1991, the Tribe filed its Complaint in this matter. The Complaint contains allegations that each of the defendants, with the exception of Robert Earl Holding,[9] own lands within the boundaries of the Crow Reservation which exceed 1280 acres of agricultural or 1920 acres of grazing land. *See* Complaint, para. 14–16. In its prayer for relief, the Tribe seeks an order requiring the defendants to divest themselves of the lands allegedly held in violation of § 2.[10]

## DISCUSSION

The defendants and intervenors in this action have joined in a motion to dismiss, alleging numerous grounds. Some of the grounds briefed and argued more appropriately go to the merits of the action and therefore will not be considered at this stage of the proceedings. Additionally, CFC seeks summary judgment against the Tribe on statute of limitations grounds. Having fully considered the arguments advanced in open court and in over 450 pages of briefs, I find two threshold matters dispositive of the case.

### CFC's Motion for Summary Judgment

■ A motion to dismiss by CFC under Rule 12(b)(6) is directed at the complaint in

this matter on the ground that Montana's five-year statute of limitations applies to all challenges to ownership of lands acquired in alleged violation of § 2, whether acquired from Crow Indians who held fee patents, or through sales supervised by the government. Pursuant to Fed.R.Civ.P. 12(b) the court considers matters outside the pleadings and treats the motion to dismiss on this ground as a motion for summary judgment.

### Statutes of Limitation

In support of its motion for summary judgment on this ground, defendant CFC submitted the uncontroverted affidavit of Ronald A. Pisk, establishing that (1) CFC has not purchased any land on the Crow Reservation from a Crow Indian within five years prior to the filing of the complaint herein, and (2) CFC did purchase one piece of land (160 acres) from a non-Indian within five years prior to the filing of the instant complaint. In response, the Tribe asserts that 28 U.S.C. § 2415 controls and provides the Tribe with an unlimited period of time within which to sue for violations of § 2.

■ Upon careful review of the arguments advanced, I find the Tribe's assertion unconvincing. It is well established that federal claims are subject to state statutes of limitation unless there is a federal statute of limitations or a conflict with federal policy. *See,* e.g., *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 507, 106 S.Ct. 2039, 2045, 90 L.Ed.2d 490 (1986) (citations omitted). Contrary to assertions by the Tribe, no federal statute of limitation exists for the

---

of the Crow Indian Reservation is unreasonable in light of the continuing policy behind the Dawes Act at the time Congress enacted the 1920 Act. § 2 may not reasonably be read in light of the Indian Reorganization Act of 1934, since such Act was still 14 years away when Congress enacted § 2. The 1920 Act, and specifically § 2, must be read and understood in its historical context. Supporting this reading of the § 2 legislative history is the fact that even Crow Indians were included in the acreage limitations until 1940. This lends credence to the reading that the purpose of § 2 was to prevent exploitation of the individual Crow allottees rather than to protect the integrity of tribal boundaries.

9. The Tribe's Complaint alleges that Mr. Holding owns only 301 acres of grazing lands within the Crow Reservation but that he exercises control over all the corporations named in the Complaint except CFC. *See* Complaint, para. 6, 12, 16, and 23.

10. In an attempt to soften the harshness of this requested relief, counsel for the Tribe in oral argument on the motion to dismiss, asserted there were other forms of relief and that this was simply the "preferred" remedy. For the purpose of the motion presently before the court, however, the requested relief is irrelevant except to disclose the Tribe's novel idea of "equity."

present action, nor will the application of a state's statute conflict with federal policy.

In the absence of controlling federal law or policy, 25 U.S.C. § 349 requires the application of the state statute of limitations in the present case, under § 2.[11] *See Dillon v. Antler Land Company*, 341 F.Supp. 734 (Mont.1972); *aff'd Dillon v. Antler Land Company*, 507 F.2d 940 (9th Cir.1974); *cert. denied* 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975). Following a recent United States Supreme Court decision, the Tribe argues for a re-interpretation of the *Dillon* analysis and holdings. The Tribe seeks to diminish the effect of *Dillon* on this case in two ways. First, the Tribe attempts to distinguish the present matter factually. It argues that § 349, if applicable at all, is correctly applied to an individual tribal member but not to the Tribe since, allegedly, the federal policy is to protect the Tribe's interest under § 2. Second, the Tribe attempts to weaken the precedential effect of *Dillon* by asserting that the recent Supreme Court decision of *County of Yakima, et al, v. Confederated Tribes and Bands of the Yakima Indian Nation*, — U.S. —, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), casts doubt on the continued vitality of *Dillon's* holding.

With respect to the Tribe's first attempt to diminish the importance of *Dillon*, it draws an invalid distinction. State law controls in all cases when allotted lands have been conveyed to individual Indians by patent in fee because Congress has explicitly determined that it does. As the district court in *Dillon* noted, the issuance of the fee patent had a broader effect than merely to free the individual Indian to sell his or her land—"it freed the United States from its trustee duties and *altered the relationship of the land* and plaintiff (individual Indian) to the State of Montana." *Dillon* at 341 F.Supp. 734, 741 (citations omitted) (emphasis added).

The relationship of the land to the State of Montana is altered by the issuance of a patent as well as the relationship of the individual Indian to the state. Accordingly, the Tribe's contention that § 349 applies state law only to the individual allottee is too narrow a reading and therefore without merit.

The Tribe's assertion that the recent *Yakima* decision questions the validity of the holding in *Dillon* is without merit as well. Contrary to the Tribe's contentions, the *Yakima* case does not bring into question the *Dillon* courts' holdings. Rather, it strengthens them. The question posed by the consolidated *Yakima* cases was whether the County of Yakima could impose an ad valorem tax on so-called "fee-patented" land located within the Yakima Indian Reservation, and an excise tax on sales of such land.

The Tribe in the instant case argues that the Supreme Court upheld Yakima County's authority to impose ad valorem taxes on Indian owned fee land on the basis of § 5 of the Indian General Allotment Act, rather than § 6.[12] The Tribe also seeks to limit the application of § 349 through the Supreme Court's reference to the first sentence of § 349 limiting the statute's applicability to "allottees" as opposed to their heirs, grantees or subsequent owners. The Tribe argues as well that the reasoning of the Supreme Court in *Yakima* inescapably leads to the conclusion that neither § 347 nor 349 should be extended beyond their plain and literal meaning to encompass actions brought by unterminated Indian tribes.

I do not agree with the Tribe's evaluation of *Yakima*. The Court reasoned that a fee patent would not subject its Indian owner to *plenary* state jurisdiction but fee ownership would free the *land* of "all restrictions as to sale, incumbrance or taxation." *Yakima*, — U.S. at —, 112 S.Ct. at 686 (quoting 25

---

11. Mont.Code Ann. § 70–19–401 states,

    No action for the recovery of real property or for the possession thereof can be maintained unless it appears that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the property in question within five years before the commencement of the action.

The uncontroverted affidavit of Mr. Pisk clearly shows that CFC has purchased no land (with the exception of 160 acres) within the five-year period required by Mont.Code Ann. § 70–19–401.

12. § 6 of the Indian General Allotment Act of 1887 is the same statute, 25 U.S.C. § 349, under consideration in the present motion.

U.S.C. § 349).[13] In the opinion, the Court drew a distinction between *in rem* and *in personam* jurisdiction and maintained that there was no impediment, statutory or otherwise, to a state's *in rem* jurisdiction over lands patented in fee. *Yakima,* —— U.S. at —— ——, 112 S.Ct. at 689–92. Consistent with this reasoning is the proposition that the land itself carries state jurisdiction over sales and alienation and the identity of the claimant, i.e., Tribe vs. allottee, does not affect the state's jurisdiction over the *land.*

Likewise, in the present matter, the clear language of § 2 removes the restriction on alienation if land is in fee patent and therefore subjects the land to the *in rem* jurisdiction of the state. Moreover, 25 U.S.C. § 349 is adequate to confer *in rem* jurisdiction on the State of Montana over the land in question, regardless of whether the individual allottee or the Tribe brings the lawsuit.

■ The Tribe argues, apart from the *Yakima* decision, that even if state law applies to individual allottees, it does not follow that state law applies to the Tribe under § 2. The Tribe asserts that when Indian tribes sue to vindicate their property rights the action is governed by federal, not state, law.[14] As a result, the Tribe argues, state-created defenses based upon the passage of time, such as statutes of limitation, adverse possession, estoppel or laches may not be applied to defeat tribal claims when such defenses would be inconsistent with federal policy. This is true only when the tribes have legitimate property rights to assert. The authority offered by the Tribe presupposes a pre-existing unsevered or unterminated property right. In the present matter, the Tribe has no legitimate property right to assert. The Tribe acknowledges it has no claim to legal title. Instead, it seeks equity, allegedly while standing in the shoes of the United States government, and brings the present action since the government has failed to

bring a suit as trustee of the Tribe's interests.

The problem with the position espoused by the Tribe is that a fee simple patent operates to invest the recipient with the title to the patented land, and to divest the United States of it. *Larkin v. Paugh,* 276 U.S. 431, 439, 48 S.Ct. 366, 368, 72 L.Ed. 640 (1928). With the issue of a patent in fee, the title passed from the United States. At the same time, the prior trust and the incidental restriction against alienation were terminated. *Id.* at 439, 48 S.Ct. at 368. The alienation of title also severed the authority of the Secretary of the Interior to guard the trust in the interest of the Tribe. Therefore, any questions pertaining to the title are subject to examination and determination pursuant to state law where the land rests. Once fee patents were issued on the land in question in this case, the trust relationship was terminated, likewise terminating the Tribe's ability to "stand in the shoes" of the United States government.

The Tribe's reliance on 28 U.S.C. § 2415 as the applicable statute of limitation is based on faulty premises. The Tribe's first faulty premise is that the United States *could* be a party to this action *if* it is characterized as an action to establish title to real property. This is inappropriate for the reason noted above. Not even the United States may bring an action to establish title to real property in the present case, under § 2415(c), once a patent in fee was issued. The Tribe's reliance on *Oneida II* and related cases is unpersuasive. In *Oneida II* the possessory rights being claimed were clearly federal rights to the land at issue and the tribe sued to enforce their aboriginal land rights. In the present case, the allotments and subsequent fee patents issued on the land in question extinguished any legal claim the Crow Tribe or United States government had to the land.[15] Congressional intent to allow for

---

**13.** § 349 assured for "prematurely" patented land what § 5 of the General Allotment Act (25 U.S.C. § 348) implied with respect to patented land generally: land held by the patentee which was free of all encumbrances.

**14.** For this proposition the Tribe relies on *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226,

105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (*"Oneida II"*) and similar cases.

**15.** I do not mean to imply by this discussion that the United States has *no* recourse once a fee patent is issued. Theoretically, the Attorney General of the United States could bring an action to cancel the previously issued patents

the extinction of Indian title under the Allotment Act is plain and unambiguous.

The Tribe's second faulty premise in encouraging the application of § 2415 is that the United States *could* be a party to this action *if* it is characterized as an action for trespass damages under subparagraph (b). This is inappropriate for the reason noted above as well. Once a patent in fee was issued, the United States had no legal right to possession of the property, thus, any action for trespass damages would be fruitless.

By its terms, § 2415 has no application to land claims brought by an Indian tribe dealing with title to individually allotted, fee patented lands. The Tribe cites numerous cases for the proposition that an Indian tribe may bring a land claim, pursuant to § 2415(c), without concern for a statute of limitation. The cases are distinguishable from the present matter in that they involve land claims brought by the party claiming legal title to the contested lands.[16] In the present case, the Tribe acknowledges it has no legal claim to title of the contested lands under any legal theory. In this case, the United States has patented lands to private owners in a manner which terminated its interest and subjected

the grantees' incidents of ownership to determination by the applicable state law.[17]

Applying Montana's five-year statute of limitation will not conflict with federal policy in the instant case. The Tribe contends that this suit was brought to enforce federal restrictions and protections which were not removed or terminated. I find this unpersuasive, however, in light of the clear intent of Congress to remove all restraints on sale and alienability of land patented in fee to individual allottees.[18]

Having found that the Tribe's action against CFC for a violation of § 2 of the Act is barred by the Mont.Code Ann. 70–19–401, I further find that there is no genuine issue as to a material fact and CFC is entitled to judgment as a matter of law.[19]

### Defendants' Motion to Dismiss

### Constitutional Standing

▆▆▆ Defendants join in seeking dismissal of the complaint on the ground that the Tribe lacks constitutional standing to litigate. A determination of standing is a threshold test that must be satisfied in every federal case before a court may entertain a suit. *See, Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

---

and restore allottees to their dependent status. Such an action, if possible, however, would resolve nothing in this lawsuit. The original allottees have long since received fee patents and transferred their possessory interest in the land in question.

16. *See, e.g., Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985); *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979); *United States v. Minnesota,* 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539 (1926), involving direct tribal title (either aboriginal or by treaty). *See also,* e.g., *Board of Com'rs v. United States,* 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939); *Brooks v. Nez Perce County,* 670 F.2d 835 (9th Cir.1982); *United States v. Ahtanum Irrig. Dist.,* 236 F.2d 321 (9th Cir.1956), *cert denied Ahtanum Irrig. Dist.,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957), involving land still held in trust status.

17. Although state law generally does not apply to Indian property or to Indians on reservations, Congress has provided otherwise in some situations. *See,* e.g., *Williams v. Lee,* 358 U.S. 217,

220, 79 S.Ct. 269, 270–71, 3 L.Ed.2d 251 (1959); *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207, 107 S.Ct. 1083, 1087, 94 L.Ed.2d 244 (1987). It is the contention of defendants in this action that Congress has so provided in cases such as the one at bar in 25 U.S.C. § 349. I agree.

18. Although the Tribe may vigorously protest, prior to the Indian Reorganization Act, Congress did not conclusively express an interest in preserving tribal sovereignty. The legislative background indicates that § 2 was never intended as a cause of action after fee patented land was properly sold the first time. I therefore expect defendants are correct in asserting that the Tribe has no cause of action under § 2. I expect defendants would prevail on their motion to dismiss for failure to state a claim for the same reason. It is simply unnecessary, however, to address those issues in detail since the two threshold issues dealt with in this Memorandum are dispositive.

19. This is the case with regard to all but the 160 acres conveyed to CFC on August 8, 1989, from Thomas Campbell Bassett and John P. Murray. *See Affidavit of Ronald K. Pisk,* p. 2.

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id.* A plaintiff may not invoke the powers of the federal courts unless he can meet three Article III requirements:[20] (1) that he personally suffers some actual or threatened injury, *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)); (2) that the injury "fairly can be traced" to the defendant's putatively illegal conduct, *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976); and (3) that the injury is "likely to be redressed by a favorable decision." *Id.* at 38, 96 S.Ct. at 1924. While the Supreme Court has admitted that these requirements are "concepts concededly not susceptible to precise definition," *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), *reh. den.* 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984), it has clearly specified that the plaintiff's injury must be "distinct and palpable," *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206, not "abstract," "conjectural," or "hypothetical." *Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983).

■ When there is no statute granting an express right of action, courts employ several other "prudential" limitations on standing to sue: (1) the plaintiff's interest must come within the "zone of interests" arguably protected or regulated by the law in question, *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); (2) the plaintiff must not allege "generalized grievances" shared in substantially equal measure by all or a large class of citizens, *See United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41

L.Ed.2d 706 (1974); and (3) the plaintiff must assert his own legal interests rather than those of third parties. *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206.

■ The focus of the standing requirement is on the status of the party seeking to bring its complaint before the court, and not on the issues the plaintiff wishes to have adjudicated. *McKinney v. United States Dept. of Treasury*, 799 F.2d 1544, 1549 (Fed. Cir.1986). A review of the complaint in the present matter reveals that the Tribe has failed to establish its status as a party entitled to have the Court decide the dispute raised in the complaint.

First, the Tribe fails to meet the injury in fact requirement for constitutional standing. The Tribe's allegation that, "[t]he acreage limitations under Section 2 were designed to prevent large landowners from controlling and dominating the farming and agricultural economy on the Crow Reservation by acquiring vast amounts of land" is not a personal allegation of "actual or threatened injury." It is at best a generalized allegation of the purpose behind § 2.

The Tribe's allegation that, "[t]he Defendants' violation of Section 2 of the Crow Allotment Act harms the Tribe in that it violates the public policy behind Section 2 which was to prevent one person, corporation or company from accumulating large landholdings...." is not an allegation of a "concrete and immediate" injury to the Crow Tribe. It is a generalized assertion of policy considerations behind § 2 and a speculative inference of the effects of landowners owning large amounts of land.

The Tribe's allegation that, "[d]efendants' actions in violating Section 2 of the Crow Allotment Act have harmed the Crow Tribe by preventing the Tribe and its members from enjoying the use of lands within the Crow Reservation and by harming the agricultural and grazing economy within the Reservation" is merely an abstract contention of harm. The Tribe has no legal interest in the

---

**20.** Some courts seem to adhere to two requirements, with the ability to trace the injury to the challenged action and the likelihood of redress being simply two facets of a single causation

requirement. *See e.g., Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 74, 98 S.Ct. 2620, 2631, 57 L.Ed.2d 595 (1978).

land in question. Individual members received the land by allotment and subsequently conveyed the land to bona fide purchasers. In fact, the interests of the individual Crow allottees, if any exist, are adverse to that of the Tribe. The Tribe does not seek a return of the land to the individual allottees, but preferably to the Tribe itself. To the extent the Tribe has been precluded from the use and enjoyment of the land in question, their "controversy" is a political one, with Congress over the original Act providing for allotment to individual allottees. The Tribe is no more precluded from the use of lands within the reservation by large landholders than it is by numerous non-Indian small acreage landholders. The Tribe's allegation amounts to a veiled "controversy" over the political wisdom of the General Allotment Act. The federal judicial system is an inappropriate forum for the resolution of such a controversy. Finally, the reference to "harming the agricultural and grazing economy" by the ownership of large landholders is entirely speculative. Such general and speculative allegations do not meet Article III's injury in fact requirement.

Substantial authority exists that standing may be predicated on noneconomic injury, *see, e.g., Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 73–74, 98 S.Ct. 2620, 2630–31, 57 L.Ed.2d 595 (1978) ("environmental and aesthetic consequences"), however, the Tribe has not alleged a *concrete* injury of any kind, economic or otherwise, sufficient to confer standing.

Even if it may be rationally argued that the Tribe meets the injury in fact requirement based on vague concepts of tribal sovereignty and the expansive application standing sometimes receives in lawsuits by Indian tribes, the Crow Tribe fails to meet the requirements that the injury be fairly traceable to the illegal activity of the defendants and that the injury be fairly redressable by the remedy sought.

The Tribe's allegation of a causal relationship between its "injury" and the purchase of excess lands by the defendants requires speculation for a connection. For instance, it is highly speculative to infer that the ownership by several landowners of plots over 640 acres is in any way more harmful *to the Tribe* than the myriad non-Indian landowners of 640 acres each on the Reservation, which would be undisputedly legal under § 2. Speculative inferences are entirely necessary to connect the Tribe's alleged injury to the challenged actions of the defendants. *See, Simon,* 426 U.S. at 45–46, 96 S.Ct. at 1927–28. Moreover, the complaint suggests no substantial likelihood that victory in this suit would result in any improvement in the "agricultural and grazing economy within the Reservation," or, for that matter, any but the most abstract of benefits to the Tribe. *See, Id.*

The Tribe's reliance on *Crow Tribe v. United States,* 789 F.Supp. 398 (Dist. of Columbia, 1990), is ill-placed. First, the Memorandum in that case has no precedential effect on this Court. More significantly, the District of Columbia Court's "beneficiary" analysis is constitutionally deficient. The court found that "the Crow Tribe is a *beneficiary* of the restriction on alienation of land in Section 2 and, therefore, defendant's alleged failure to enforce Section 2 poses an actual or threatened risk of injury to the Tribe sufficient to confer standing . . . ." (emphasis added). Such an "injury" is far too abstract to meet the injury in fact requirements of Article III.

**Prudential Standing**

■ It is needless to determine whether the Tribe meets the subconstitutional prudential requirements for standing in this matter. Prudential requirements for standing are not a means of conferring standing where it would not otherwise exist constitutionally. Rather, it is a limitation on standing, although the Article III requirements are met, "where no individual rights would be vindicated and to limit access to federal courts to those litigants best suited to assert a particular claim." *See, Gladstone, Realtors v. Bellwood,* 441 U.S. 91, 99, 100, 99 S.Ct. 1601, 1607, 1608, 60 L.Ed.2d 66 (1979). In this case, the Tribe has failed to meet the minimum Article III requirements.[21]

21. Although it is unnecessary to analyze in detail, I suspect that prudential principles, as well,

### Representational Standing

 The Tribe's assertion of representative standing is baseless. It argues that it has standing to assert the rights and interests of its general membership who are allegedly adversely affected by the defendants' excess landholdings. Representative standing is established if an organization demonstrates that (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and, (3) individualized participation is not necessary for the claim asserted or the relief requested. *Hunt v. Washington State Apple Advertising Com.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). If, for the sake of argument, the Tribe is correct in asserting that "the purpose of Section 2 was to protect the interests of the Crow Tribe as a whole, not the rights or the interests of the allottees," then individual members of the Tribe would have no standing to sue. Thus, the first prong of *Hunt* is not satisfied. If, however, individual tribal members (grantors) could sue, their claims, as initially admitted by the Tribe, are clearly barred by the applicable state statute of limitation. *See, Dillon,* 341 F.Supp. at 741. In an apparent attempt to avoid this quandary, the Tribe insists on representational standing by purporting to act on behalf of its *general membership,* rather than individual Indian grantors, contending that "the Tribe and its members are inseparable" (*See* Memo In Opposition to Motion to Dismiss, p. 59, n. 25). If this is true in the present context, then the Tribe is barred by the same statutes of limitation that the Tribe initially acknowledged bar individual members' claims. If, however, as the Tribe argues, it is not bound by the same statutes of limitation that bind its members, then it clearly is not acting in a representational capacity, but rather in a capacity independent of its members.

Based on the foregoing, I find that the Tribe has failed to establish sufficient standing to entitle it to have the court decide the merits of the dispute or the issues involved. Having failed to meet the threshold test of standing, the present case is appropriate for dismissal.

Accordingly,

**IT IS ORDERED** that CFC's motion for summary judgment is hereby granted.

**IT IS FURTHER ORDERED** that defendants' motion to dismiss is hereby granted as to all defendants in this matter.

The Clerk of Court is directed to enter judgment accordingly.

The Clerk is further directed to forthwith notify the respective parties of the making of this order.

### ORDER

The Court, having considered the Motion of Crow Tribe for Leave to File Supplemental Memorandum;

IT IS HEREBY ORDERED that the Motion of the Tribe to file its Supplemental Memorandum is granted.

---

would counsel against conferring standing on the Crow Tribe in this matter. Under such principles, standing should be denied if a party presents "abstract questions of wide public significance" or "generalized grievances" that may be appropriately addressed by the political branches. *See, Valley Forge,* 454 U.S. at 474–75, 102

S.Ct. at 761–62. The issues raised by the Crow Tribe in the present lawsuit are really generalized grievances over the checkerboard effect of the General Allotment Act on their Reservation— issues more appropriately discussed and resolved by the political branches.