The CROW TRIBE OF INDIANS,
Plaintiff–Appellant,

v.

CAMPBELL FARMING CORPORATION;
Robert Earl Holding; Sinclair Oil Corporation, d/b/a Sunlight Ranch Company; Sun Valley Company; and KMH Ranch Company, Defendants–Appellees.

No. 92–36612.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 5, 1994.

Decided July 20, 1994.

Robert S. Pelcyger, Fredericks & Pelcyger, Boulder, CO, for plaintiff-appellant.

Laurence R. Martin, Felt, Martin & Frazier, Billings, MT, for defendant-appellee Campbell Farming Corp.

Michael E. Webster, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, MT, for defendant-appellee Robert E. Holding.

George C. Dalthorp, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, MT, for all other defendants-appellees.

Andrea Nervi Ward, U.S.Dept. of Justice, Washington, DC, for amicus.

Before: WRIGHT, CANBY, and T.G. NELSON, Circuit Judges.

Opinion by Judge CANBY.

CANBY, Circuit Judge:

The Crow Tribe of Indians brought an action against Campbell Farming Corporation, Robert Earl Holding and several companies controlled by Holding for violating section 2 of the Crow Allotment Act of 1920. The district court granted the defendants' motion to dismiss on the grounds that the Tribe lacked standing to enforce the statute and that the Tribe's claims were barred by the Montana statute of limitations. 828 F.Supp. 1468. Finding that the Tribe has no right of action under the provision in question, we affirm.

## BACKGROUND

The Crow Indian Reservation encompasses roughly 2.3 million acres of land in southeastern Montana. In the Crow Allotment Act, 41 Stat. 751 (1920), Congress provided for the allotment of lands of the Tribe to individual members. Section 2 of the Act generally

forbids the Secretary of the Interior from approving any direct or indirect conveyance of land from a Crow Indian to any person or company that owns 640 acres of agricultural or 1,280 acres of grazing land within the present boundaries of the Reservation. It also forbids approval of any conveyance to one who already owns land if, after the conveyance the person or company would own more than 1280 acres of agricultural or 1920 acres of grazing land. In addition to the directive to the Secretary, section 2 provides that any conveyance exceeding the acreage limitations is void. Anyone obtaining land in violation of the statute is subject to criminal penalties.

Campbell Farming Corporation allegedly owns more than 45,000 acres of land situated on the Reservation. Robert Earl Holding and companies under his control likewise allegedly own 140,000 acres of Reservation land. Asserting that these property interests clearly violate the acreage limitations set out in section 2 of the Act, the Tribe brought an action for a declaratory judgment that the landowners' titles to these lands were void. The Tribe also sought to enjoin a proposed sale of land from Campbell Farming Corporation to Robert Holding.

In its prayer for relief, the Tribe requested that the defendants be divested of all lands in excess of the acreage limitations; that the Tribe be awarded damages for the illegal use, occupancy, and enjoyment of the land; and that the court award the Tribe trespass damages and attorney's fees.

Reasoning that the Tribe lacked standing to bring the action and, in any case, that the action was barred by the Montana statute of limitations, the district court granted the defendants' motion to dismiss. The Tribe appealed.

## DISCUSSION

### I. Introduction

The issue in this case is whether the Crow Tribe is a party entitled to maintain an action to enforce section 2 of the Crow Allotment Act. The district court characterized this question as one of standing. Applying traditional constitutional standing analysis, *see, e.g., Lujan v. Defenders of Wildlife,* — U.S. —, —, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), the district court ruled that the Tribe failed to plead sufficiently each element of standing.

■ The issue indeed bears some of the hallmarks of a standing problem. Resolution turns largely on the identity of the party bringing the suit rather than the merits of the claim. And it is a threshold issue of law that may be resolved early in the litigation on the pleadings. Although we agree with the district court that "the Tribe has failed to establish its status as a party entitled to have the court decide the dispute raised in the complaint," we resolve the dispute not under traditional standing analysis, but by examining whether section 2 vests the Tribe with a right of action.[1] We conclude that it does not.

### II. Analysis

■ We review this purely legal issue *de novo.* See *Nevada v. Burford,* 918 F.2d 854, 856 (9th Cir.1990) (standing), *cert. denied,* 500 U.S. 932, 111 S.Ct. 2052, 114 L.Ed.2d 458 (1991). In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975), the Supreme Court laid down four factors to inform our determination of whether a statute creates a private right of action. First, we must consider whether the plaintiff is a member of "the class for whose *especial* benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff?" *Id.* (citations and quotations omitted). Second, and most important, we must examine whether Congress intended to create or deny a right of action. *Id.* If these inquiries do not resolve the issue, we must consider, third, whether a right of action in the plaintiff furthers the purpose of the legislative scheme at issue. *Id.* Finally, we must inquire whether inferring a federal cause of action would be inappropriate, because the area of law is one traditionally governed by state law. The focal point for

---

1. We may affirm the judgment of the district court on any ground supported by the record.

See *Suydam v. Reed Stenhouse of Washington, Inc.,* 820 F.2d 1506, 1508 (9th Cir.1987).

our inquiry is the second factor, legislative intent. *Harper v. Federal Land Bank of Spokane,* 878 F.2d 1172, 1174 (9th Cir.1989), *cert. denied,* 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990). The first two factors are sufficient to inform our judgment in this case.

### A. Especial Benefit of the Plaintiff

In considering whether the Tribe is a member of the class of people whom the law was intended to benefit, we first examine the language of the relevant provision, section 2 of the Crow Allotment Act:

> Sec. 2. No conveyance of land by any Crow Indian shall be authorized or approved by the Secretary of the Interior to any person, company, or corporation who owns at least six hundred and forty acres of agricultural or one thousand two hundred and eighty acres of grazing land within the present boundaries of the Crow Indian Reservation, nor to any person who, with the land to be acquired by such a conveyance, would become the owner of more than one thousand two hundred and eighty acres of agricultural or one thousand nine hundred and twenty acres of grazing land within said reservation. Any conveyance by any such Indian made either directly or indirectly to any such person, company, or corporation of any land within said reservation as the same now exists, whether held by trust patent or patent in fee shall be void and the grantee accepting the same shall be guilty of a misdemeanor and be punished by a fine of not more than $5,000 or imprisonment not more than six months or by both such fine and imprisonment.

41 Stat. 751, 752 (1920).

Although its absence is not conclusive, we observe that the Tribe is not one of the actors mentioned in section 2. The provision mentions "any Crow Indian," the Secretary, and any person, company or corporation. The first term unambiguously refers to Indians in their individual capacities. Conspicuously absent is any reference to the Tribe or even a vague reference to "Indians" that might create room for argument. The use of such specific terms in the statute suggests that the statute was enacted for the benefit of a group of individuals, each of whom is a member of the Tribe, and not for the benefit of "the Tribe."

A statutory remedy is also an indicator of whom Congress sought to benefit when it drafted a statute. The remedial structure of the provision is clear. Section 2 unambiguously contains three mechanisms for insuring that the acreage limitations are not exceeded. First, a mandate: it forbids the Secretary from approving conveyances that exceed the acreage limitations. Second, a penalty: it imposes misdemeanor criminal sanctions on those who purchase land in excess of the acreage limitation. Finally, a civil remedy: any conveyance of title in violation of section 2 is void.

The specificity and comprehensiveness of this remedial structure is a likely indication that the list is exhaustive. *See In re Mexico City Aircrash of October 31, 1979,* 708 F.2d 400, 407 (9th Cir.1983) (express statutory administrative remedies exclude implied cause of action under Federal Aviation Act). Undoubtedly, Congress did not expect the secretarial mandate or the prosecution functions to be exercised by the Tribe. The civil remedy, likewise, provides no remedy to the Tribe. The Tribe was not a party to any of the forbidden transactions, and was not an owner of the transferred land. When a conveyance of title to property is adjudicated void, ownership of the property simply remains in the would-be transferor. In this case, for example, the title to land obtained in violation of section 2 would have remained in the original allottees. In other words, individual Indians alone, rather than the Tribe, would benefit from enforcement of the statute.[2] That the sole civil remedy Congress provided in section 2 fails directly to benefit the Tribe is a clear indication that Congress did not intend to confer a right of action on the Tribe.

---

**2.** Our discussion is limited to the remedies of allottees specified by the Act, in comparison with the absence of remedies for the Tribe. We express no opinion on the validity of any claims to the disputed property that may be asserted by others.

## B. Legislative History

Although the text and the remedial structure of section 2 provide significant insight into whether Congress intended to create a cause of action in favor of the Tribe, the legislative history of the provision's purpose is inconclusive. The history is consistent, however, with the principle that Congress intended only individual Indians to have a right of action.

The Tribe recognizes that the Act was drafted at a time when Congress anticipated the assimilation of Indians into mainstream American society. The Tribe's theory is that Congress purposefully allowed non-Indians to own small parcels of land on the Reservation because they would serve as positive role models in the Indians' transition to farmers and ranchers. According to the Tribe, the purpose of the acreage limitation in section 2 was the creation of a community of small farmers and ranchers, both Indians and non-Indians, on the Reservation.

Concentrated ownership of vast quantities of land by large interests, on the other hand, was counter to the purpose of transforming the Indians into farmers and ranchers. *See, e.g.,* H.R.Rep. No. 1043, 66th Cong., 2d Sess. at 3–4 (1920) ("it is not thought to be good public policy or for the best interests of the Indians to permit any one firm, person, or corporation to acquire any great acreage of the land"). Large landowners, it apparently was feared, might turn the Indians off the land or transform them into mere sharecroppers. In the view of the Tribe, then, section 2 was intended to insure that the Reservation was characterized by small farmers and ranchers and to prevent the tendency toward ownership of large tracts.

The defendants ascribe a much more limited purpose to section 2. Because many of the Indians' lands were subject to long term leases that decreased the value of the land, and because many Indians could easily be separated from their lands by land speculators who possessed hard cash, the defendants argue, Congress merely enacted section 2 to prevent the Indians from selling their land to speculators. The acreage limitation was especially effective against speculators because speculators frequently dealt in large quantities of land.

Although both readings of the legislative history are plausible (and perhaps both are correct), we need not decide between them because the Tribe's assessment of the legislative purpose does not support a finding that Congress intended to confer a cause of action on the Tribe. The Tribe's description of the legislative history is more consistent with the view that Congress expected individual members of the Tribe to enforce the provision. Even under the Tribe's interpretation, the Act was drafted to make individual Indians more independent and to encourage them to become more reliant on their own individual parcels of land. Under these circumstances, it is reasonable to assume that Congress expected individual Indians to bring their claims on their own behalf, rather than to expect the Tribe to protect their rights.

The Tribe urges that it has an interest in the character of its Reservation wholly apart from the interests of the individual Indians who were allottees or their successors. That may well be true, but nothing in the text or history of the Act supports the view that Congress conferred on the Tribe a right of action to protect that interest. "The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries." *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981). We decline to insert the Tribe into the highly explicit provisions of the Act when Congress so clearly seems to have meant not to put it there.

## CONCLUSION

Because the language and remedial structure of section 2 of the Act indicate that Congress did not intend to vest the Tribe with a cause of action and because the Tribe has failed to cite any legislative history that militates toward an opposite conclusion, we conclude that the Tribe cannot maintain this action. This conclusion makes it unnecessary for us to address the questions whether the Tribe lacks traditional standing or whether the state statute of limitations bars the Tribe's claim.

The judgment of the district court is AFFIRMED.